UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GEORGE M. LENIART          :
                           :
v.                         :   CIV. NO. 3:09CV9(HBF)
                           :
WILLIAM BUNDY, et al.      :
                           :

## RULING ON PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW [DOC. #265]

Plaintiff George M. Leniart ("plaintiff") brought this civil rights action under 42 U.S.C. section 1983, alleging that defendants[1] violated his constitutional rights by conducting warrantless searches of his residence and unlawfully arresting him on two separate occasions. See Doc. #35, Amended Complaint.[2] A jury trial was held on February 10 through 13, 2015, on the following claims: (1) unreasonable search on October 5, 2006, against defendants Bransford, Hoagland, Blanchette and Bundy; and (2) unreasonable search and seizure on September 25, 2007, against defendant Ellison. At the end of evidence, plaintiff orally moved for judgment as a matter of law with respect to the September 25, 2007, seizure and examination of a microcassette audiotape by defendant Ellison. [Doc. #252]. Following oral

---

[1] William Bundy, Wilfred J. Blanchette, III, Michael Hoagland, "Ellison", and Larry Bransford (hereinafter collectively referred to as the "defendants").

[2] Plaintiff withdrew his false arrest claim against defendant Hoagland on the first day of trial. [Doc. #251].

argument, the Court denied this motion on the record before charging the jury. [Doc. #253, 254]. On February 13, 2015, the jury rendered a verdict in favor of all defendants and against plaintiff. [Doc. #256]. On February 25, 2015, plaintiff filed his Renewed Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b). [Doc. #265]. On March 18, 2015, defendants filed a Memorandum in Opposition to plaintiff's motion [Doc. #266], to which plaintiff timely filed a Reply [Doc. #274]. For the reasons articulated below, the Court **DENIES** plaintiff's Renewed Motion for Judgment as a Matter of Law. [**Doc. #265**].[3]

I.   **STANDARD OF REVIEW**

The court "will grant a motion for judgment as a matter of law only if, viewing the evidence in the light most favorable to the non-moving party, a reasonable juror would be compelled to find in favor of the moving party." Drew v. Connolly, 536 F. App'x 164, 165 (2d Cir. 2013) (citation and internal quotation marks omitted). "When evaluating a motion under Rule 50, courts are required to 'consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in its favor from the evidence.'" ING

---

[3] The disposition of this motion was delayed in light of the discovery of new evidence which prompted several telephonic conferences and the filing of a motion for new trial.

Glob. v. United Parcel Serv. Oasis Supply Corp., 757 F.3d 92, 97 (2d Cir. 2014) (quoting Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001)). "The Court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury, and must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. (quoting Tolbert, 242 F.3d at 70) (internal quotation marks omitted). "In other words, either there must be such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result o[f] sheer surmise and conjecture or the evidence must be so overwhelming that reasonable and fair-minded persons could only have reached the opposite result." Hardy v. Saliva Diagnostic Sys., Inc., 52 F. Supp. 2d 333, 336-37 (D. Conn. 1999) (collecting cases) (internal quotation marks omitted).

> In short, the court cannot substitute its judgment for that of the jury. LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995) (citations omitted). Rather, judgment as a matter of law may only be granted if:
>
> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.

<u>Munn v. Hotchkiss Sch.</u>, 24 F. Supp. 3d 155, 168 (D. Conn. 2014) (collecting cases); <u>see also</u> <u>Cotto v. City of Middletown</u>, 158 F. Supp. 3d 67 (D. Conn. 2016) ("The test on a Rule 50(b) motion is not the strength or weakness of the evidence, but whether the evidence presented was such that a 'reasonable juror would have been compelled to accept the view of the moving party.'" (quoting <u>Densberger v. United Technologies Corp.</u>, 125 F.Supp.2d 585, 590 (D. Conn. 2000))). Accordingly, "[w]here a jury has rendered a verdict for the non-movant, a court may grant [judgment as a matter of law] only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that a reasonable juror would have been <u>compelled</u> to accept the view of the moving party." <u>MacDermid Printing Sols. LLC v. Cortron Corp.</u>, 833 F.3d 172, 180 (2d Cir. 2016) (footnote and internal quotation marks omitted) (emphasis in original).

## II.  **RELEVANT FACTUAL BACKGROUND**

Bearing in mind the Rule 50(b) standard articulated above, the following comprises the relevant evidence at trial. The Court limits the following background to plaintiff's claim for the allegedly unreasonable search and seizure on September 25, 2007, against defendant Ellison.

In September 2007, plaintiff, a registered sex offender, was living in the community, having been previously released on special parole on July 5, 2007. <u>See</u> Doc. #266-2, Trial

4

Transcript (hereinafter "Tr."), at 121:5-8; 141:17-23;[4] see also
Def. Ex. 507. Plaintiff was subject to numerous parole
conditions while on special parole. Id. at 141:24-142:2; see
also Def. Ex. 505. These conditions included, in pertinent part,
that: plaintiff would live in a residence approved by his parole
officer; his parole officer had the right to visit plaintiff's
residence at any reasonable time; plaintiff would participate in
a mental health treatment program for anger management; he would
have no contact in any manner with any minors; and that
plaintiff would participate in a mental health evaluation and
treatment program for problem sexual behavior. See Def. Ex. 505.
In anticipation of his release, plaintiff also signed a State of
Connecticut Computer Access Agreement, which stated, inter alia,
that plaintiff: would not access any website that is
questionable as it relates to sexually explicit or graphic
material; would not enter, or participate in, any bulletin
boards or chat rooms of any type; and would agree to an
examination of his computer, including an examination of all
added devices, CDs or diskettes. See Def. Ex. 506.

   Plaintiff's special parole conditions also required him to
wear a GPS monitoring device, which consisted of an ankle
monitor and a box transmitter, which plaintiff wore on his

---

[4] References to pages of the trial transcript relate to the Bates
number on the lower right hand corner of each page of the
transcript, reflected at docket entry number 266-2.

waist. Tr. 144:13-145:5. In order for the GPS device to work, the ankle monitor and the box transmitter had to be within 60 feet of each other. Tr. 144:23-144:1. At the time of the September 25, 2007, search, plaintiff was being supervised by defendant parole officer Larry Bransford, to whom plaintiff complained about the GPS device malfunctioning. Tr. 145:6-9, 273:13-21, 309:19-22.[5] On the morning of September 25, 2007, defendant Bransford made a home visit to plaintiff's residence due to the malfunctioning of the GPS device, where he verified that there was in fact a problem with the unit. Tr. 274:9-18. During the visit, plaintiff indicated that he needed to go to work, and following the verification of the device's malfunction, defendant Bransford permitted plaintiff to attend work. Tr. 274:19-275:3.

---

[5] At the time of the jury trial, defendant Bransford had been employed by the Department of Correction for sixteen and a half years, the last ten of which he served as a parole officer in the special management unit, which specifically supervises sex offenders. Tr. 244:25-245:24. In addition to the conditions imposed by the parole board, Mr. Bransford testified that he had authority to give his parolees, such as plaintiff, "[a]ny direction required." Tr. 249:13-22; see also Tr. 293:5-10 ("[T]here are things that we instruct the person in under our supervision that is not spelled out [in the parole conditions] specifically." (alterations added)); Tr. 295:17-23; Tr. 314:2-8 (testimony that the first condition of the special parole release direction "says [plaintiff] will follow the instructions of the parole officer, and if I give [plaintiff] instructions to submit to a search, that's what it's implying." (alterations added)).

On September 25, 2007, defendant Bransford was supervised by defendant Parole Manager Eric Ellison. Tr. 275:4-9, 450:23-24.[6] While at plaintiff's residence, defendant Bransford called defendant Ellison to advise that plaintiff's GPS device was malfunctioning. Tr. 275:16-17. Later that morning, defendant Ellison advised defendant Bransford that plaintiff would need to be remanded to custody due to alleged parole violations. Tr. 275:19-25, 368:19-20.

Sergeant William Bundy at the time was a unit supervisor, detective sergeant, with the Connecticut State Police Eastern District Major Crime Unit located at Troop E in Montville, Tr. 423:19-424:24. He testified at trial that around July 2007, plaintiff was a person of interest in several crimes that Troop E was then investigating, including several sexual assaults. Tr. 438:8-20.[7] Between July and September 2007, Troop E was provided

---

[6] Defendant Ellison testified about his lengthy career as a parole officer, supervisor and manager, which at the time of trial spanned fourteen years. Tr. 450:14-22. At the time in question, defendant Ellison was the Parole Supervisor for the Special Management Unit. Tr. 450:25-451:1. This unit has "statewide responsibility for the supervision of all paroled sex offenders[,]" and provides "more intensive supervision." Tr. 451:4-11. The officers working in this unit "receive specialized training in risk factors related to sexual recidivism ... in the needs and treatment factors related to treatment of sex offenders ... [and] with regard to victim advocacy." Tr. 451:12-21 (alterations added).

[7] Sergeant Bundy also testified that there was a time in 2006 that his office was investigating plaintiff for "several complaints involving [plaintiff] with respect to sexual assaults

information by witnesses to, and victims of, crimes allegedly committed by plaintiff. Tr. 438:21-439:4. Sergeant Bundy testified that around September 25, 2007, one of his detectives had been in contact with Parole Officer Cartagena regarding this information about plaintiff, and in light of these allegations, Sergeant Bundy "reached out to then program manager Eric Ellison, to bring the information to [parole's] attention." Tr. 439:7-13 (alterations added). At a meeting with Parole Officers Cartagena and Ellison, Sergeant Bundy provided these officers with copies of the witness and victim statements relating to the crimes allegedly perpetrated by plaintiff. Tr. 439:14-19, 455:23-456:11. One of these sworn statements was that of Doug Leniart, plaintiff's son, which described, inter alia, an alleged sexual assault by plaintiff on "a kid ... from New York." Tr. 456:6-458:18; see also Def. Ex. 537. Defendant Ellison was also provided with the "statement from [a] confidential victim to law enforcement officials in the state of New York[,]" which also described an alleged sexual assault on the victim by plaintiff, as well as plaintiff providing the victim with alcohol to the point of intoxication. Tr. 459:14-461:15; see also Def. Ex. 539. Defendant Ellison was also provided with another sworn statement from the confidential

---

in the town of Montville, several assaults in the town of Montville." Tr. 425:14-21 (alterations added).

victim to the Connecticut State Police, which again detailed an alleged sexual assault on the minor victim by plaintiff, as well as plaintiff providing the minor victim with alcohol to the point of intoxication. Tr. 461:19-465:18; see also Def. Ex. 538.[8]

The information contained in these statements raised a number of immediate concerns for defendant Ellison, including that plaintiff had committed numerous parole violations, that is, assault of a 17-year old male; conveyance of alcohol to a minor; and the consumption of alcohol by plaintiff. Tr. 466:12-16. Defendant Ellison testified that the sworn statements with which he was provided set forth sufficient evidence for him to authorize plaintiff's remand to custody. Tr. 466:16-21, Tr. 439:20-24. Specifically, based on defendant Ellison's "knowledge and training with sex offenders, [he determined] that [plaintiff] was recidivating, was not following his parole conditions, was violating possible numerous other conditions of his parole and that he had to be returned to custody in order to protect the public and to protect future victims[.]" Tr. 466:22-467:3 (alterations added); see also Tr. 476:9-477:25 (Defendant Ellison's testimony delineating the conditions of parole violated). Further contributing to this decision was Parole Officer Bransford providing defendant Ellison with a history of

---

[8] The charges against plaintiff related to these allegations were ultimately dismissed. See Tr. 509:13-15.

plaintiff's "past sexual offenses, past sexual conviction, [and] the type of behavior involved[.]" Tr. 467:7-15 (alterations added).

After receiving the direction to remand plaintiff to custody, and developing with the Connecticut State Police a proposed plan of action to complete the remand, Parole Officer Bransford contacted plaintiff and directed him to return to his residence and wait there until the GPS technician arrived. Tr. 276:9-19, Tr. 480:15-481:4. When Parole Officer Bransford arrived at plaintiff's residence with the other law enforcement and parole officers, plaintiff did not answer the door to the residence, causing the officers to conduct a search of the surrounding area for approximately an hour and a half. Tr. 278:9-279:4, 280:1-3, 368:16-22, Tr. 443:2-11, Tr. 483:20-25. Parole Officer Cartagena eventually found plaintiff lying facedown next to a stonewall on the property. Tr. 280:9-281:11, Tr. 325:15-16, 370:12-371:1, 443:15-22, 484:1-10. Plaintiff was then secured in a law enforcement vehicle, while the parole officers conducted a search of plaintiff's residence. Tr. 281:15-282:11, 325:19-326:1.

Plaintiff told defendant Ellison which of his keys would provide access to the residence. Tr. 282:7-9, 326:2-5, 374:1-12, 444:23-445:3, 490:1-3. During the search, Parole Officer Bransford testified that he "was looking for anything that

[plaintiff is] not supposed to have, anything of deviant sexual interests, ... the GPS unit, weapons, alcohol, drugs." Tr. 282:22-283:1 (alterations added); see also Tr. 326:24-327:17 (Bransford testimony on cross-examination that the parole officers "were looking for any storage device that he should not have had, whether it be a computer, a laptop ... anything he shouldn't have, whether it be alcohol, drugs, a human being, a child – anything we were looking for, anything that he would not be in compliance with the conditions of his supervision."). Specifically, the parole officers were searching for "anything that would imply deviant sexual interest," and evidence that plaintiff had contact with minors. Tr. 344:16-24.

Defendant Ellison testified that it was his intent to recover plaintiff's laptop, establish that the laptop belonged to plaintiff, and have the laptop forensically examined for evidence of any criminal activity or of a parole violation that was referenced in the sworn statements provided to Troop E. Tr. 488:1-489:17. Defendant Ellison also instructed the other parole officers on site to "assist [him] in conducting a search for the laptop, for the GPS device, and anything else associated with a parole violation." Tr. 490:1-6; see also Tr. 494:7-21 (Defendant Ellison testimony: "I was looking for anything that would be any evidence of any of the potential crimes or parole violations that were listed in those statements and any of the violations

that I planned to charge Mr. Leniart with. It was important for me to determine if Mr. Leniart had had contact with the victims of those statements ... It was important for me to determine if there were any references to the use of alcohol or illegal drugs or any other sexual assault victims. So it was important to seize [the laptop] and any other device or object that was relevant to my parole investigation, to this parole investigation." (alterations added)). On cross-examination, defendant Ellison confirmed that he was specifically concerned with the sexual assault and alcohol related allegations set forth in the sworn victim and witness statements. Tr. 509:2-5; 514:3-10.

Defendant Ellison further articulated the basis upon which he believed the search was justified:

> I believed I had sufficient evidence to conduct a search of that residence. I had reasonable suspicion to conduct a limited search of the residence, which I did. The search was limited to Mr. Leniart's bedroom and basement area because Mr. Leniart identified that as being his living space. That was the extent of our search. It was specifically to locate any evidence associated with the numerous parole violations that I had, that I delineated, that I determined Mr. Leniart would be facing charges for, parole charges.
>
> ...
>
> My understanding is that based on the parole violations, my investigation of the parole violations, I had the authority to conduct a search based on reasonable suspicion, based on witnessing Mr. Leniart not following Officer Bransford's instructions, attempting to flee, my observation of Mr. Leniart not

> wearing his GPS device, and all of the charges, all of
> the concerns, the behaviors, in the two apartments,
> that I reviewed. I believed I had clear authority to
> search Mr. Leniart's living space.

Tr. 490:6-491:1.[9] Defendant Ellison further testified that he was

permitted to search plaintiff's bedroom "because [he] was

conducting an investigation into [parole] violations, and [he]

believed there was reasonable suspicion that – evidence or

information was in Mr. Leniart's bedroom because that's where

the alleged offense occurred." Tr. 516:16-20 (alterations

added).

During the search, parole officers found a closed-captioned

television system with a recording device and VHS tapes, all of

---

[9] Parole does not have the authority to request search warrants.
See Tr. 515:10-16. Rather, defendant Ellison testified that his
"ability to search is based on reasonable suspicion, which is
granted to me by parole by my duties. The premise of reasonable
suspicion to search parolees when there's a violation, that's
the authority that [parole] relies on." Tr. 515:17-23
(alterations added); see also Tr. 521:20-21 (Ellison's testimony
that he does not "know how to get a warrant for a noncriminal
matter[.]"); Tr. 524:19-16 ("[T]here is no mechanism to get a
search warrant for a noncriminal matter. Search warrants are for
criminal matters. Search warrants – parole officers aren't even
trained in getting search warrants because they don't apply to
technical violations of parole matters under the jurisdiction of
the Board of Pardons and Paroles. Those are noncriminal matters.
The offenders are already convicted. They're in our
jurisdiction. Search warrants are a realm of the police. ... So
I mean to say I don't know how to get a search warrant. I've
never been trained. There is no – a search warrant would not be
received or signed. There is no process because we have the
authority to conduct searches when there's reasonable
suspicion.").

which were seized. Tr. 376:1-8,[10] Tr. 483:3-8. Defendant Ellison also seized from Mr. Leniart's bedroom plaintiff's laptop, which was contained in a laptop bag. Tr. 496:16-18.[11]

Following the search of plaintiff's residence, plaintiff was taken for questioning by the Connecticut State Police to the Troop E barracks. Tr. 497:20-498:12. While plaintiff was being interviewed, defendant Ellison, in the next room, started looking through the laptop bag, where he found a micro-cassette recorder. Tr. 498:12-16; see also Tr. 519:13-22. As to the importance of the micro-cassette, defendant Ellison testified:

> Again, just as the VHS tapes may have been evidence to the parole violations, I retained that micro-cassette recorder. I seized that micro-cassette recorder pursuant to my duties in investigating a parole violation of Mr. Leniart, and I believed I had full authority, I had reasonable suspicion. I have more than reasonable suspicion when I witness Mr. Leniart hiding behind that stone wall; I had more than reasonable suspicion when Mr. Leniart was not wearing

[10] With respect to the micro-cassette that was seized, Officer Cartagena testified: "We look at these media tapes in efforts for looking at further violations. It's not uncommon for individuals who have been convicted of a sexual offense to record some of these acts or further acts that would happen. So we've got to monitor in order to see if there's any violations there. We have to, you know, gather the information, look at it, and make sure the person is complying with their conditions." Tr. 374:12-20.

[11] As to why the VHS tapes were seized, defendant Ellison testified: "The description in the statements described a sexual offense occurring in Mr. Leniart's bedroom, and I was, as pursuant to my duties as a parole supervisor, I was investigating a parole violation. I wanted to see if there was anything relevant to those allegations that may have been taped on those VHS tapes." Tr.: 496:21-497:2.

his GPS device, to conduct a parole violation
investigation.

Tr. 498:18-499:4. Defendant Ellison further testified as to his

understanding of his authority to seize the micro-cassette tape:

> My authority to seize a micro-cassette tape in this
> instance was based on reasonable suspicion related to
> the parole violation, reasonable suspicion that a
> violation had occurred. ... When there's reasonable
> suspicion, I would have the authority to seize any
> device, any item, related to that investigation, such
> as a micro-cassette recorder, a laptop computer. VHS
> tapes, a beer can.

Tr. 522:14-523:6.

Ellison then directed Parole Officer Cartegena to deliver

the laptop and micro-cassette to the state police crime lab for

examination to look for parole violations. Tr. 377:18-21,

382:16-383:17, 390:24-391:14, 499:10-12, 520:9-14. Defendant

Ellison did not personally listen to the tapes. Tr. 520:17-18.

No warrant was obtained for the forensic examination of the

micro-cassette. Tr. 521:22-24.

## III. **DISCUSSION**

Plaintiff renews his Rule 50(b) motion as to the 2007

warrantless seizure and examination of the micro-cassette audio

tape. [Doc. #265]. As noted above, the only defendant implicated

in this issue is defendant Ellison. In addition to incorporating

his arguments made at the conclusion of defendants' case,

plaintiff generally argues that the warrantless seizure and

examination of the tape violated plaintiff's Fourth Amendment

rights because: (1) nothing in plaintiff's parole conditions provided an adequate basis for defendant Ellison to search for, seize and examine the micro-cassette; (2) plaintiff's purported consent to search for and seize his computer did not extend to the micro-cassette which was discovered in plaintiff's laptop bag; and (3) defendant Ellison did not have reasonable suspicion to suspect that the micro-cassette contained evidence of plaintiff's alleged parole violations. See Doc. #265. In reply, plaintiff focuses his arguments on the fact that there was no evidence adduced at trial linking the micro-cassette to the alleged sexual assaults. See Doc. #274. Defendants generally respond that there is ample evidence supporting the jury's verdict, including evidence that the search and seizure of the micro-cassette was reasonably related to the investigation of alleged parole violations. See Doc. #266. Before addressing the lawfulness of the seizure and subsequent examination of micro-cassette, the Court turns first to the law applicable to searches conducted by parole officers and the expectations of privacy afforded to individuals on parole.

### A. Fourth Amendment Applied to Parole Officers and Parolees

"The reasonable-expectation-of-privacy approach for deciding whether a search has occurred within the meaning of the Fourth Amendment derives from Justice Harlan's concurrence in Katz v. United States, 389 U.S. 347 (1967), which affirms that

the Fourth Amendment protects against invasions upon an individual's 'reasonable expectation of privacy.'" El-Nahal v. Yassky, 835 F.3d 248, 253 n.2 (2d Cir. 2016) (quoting Katz, 389 U.S. at 460 (Harlan, J., concurring)). "Consistently with Katz, th[e Supreme] Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." Smith v. Maryland, 442 U.S. 735, 740 (1979) (collecting cases) (alterations added).

A parolee, unlike ordinary citizens, does not enjoy absolute liberty under the United States Constitution, but only conditional liberty. See Morrissey v. Brewer, 408 U.S. 471, 480 (1972). By virtue of their status, parolees have diminished expectations of privacy from intrusion into their personal lives. See United States v. Julius, 610 F.3d 60, 65 (2d Cir. 2010); Samson v. California, 547 U.S. 843, 850 (2006) ("[P]arolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."). "The rights diminished by parolee status include Fourth Amendment protections from intrusions by parole officers." United States v. Thomas, 729 F.2d 120, 123 (2d Cir. 1984) (collecting cases). Additionally, if a parolee has been charged with violating conditions of his

parole and a remand for his re-imprisonment has been issued,
then the parolee's legitimate expectations of privacy are
further reduced. See Julius, 610 F.3d at 65.

A parole officer has legal custody of the parolee to whom
he is assigned, which imposes on the parole officer a duty to
monitor that parolee's adherence to the terms of his parole. See
United States v. Thomas, 729 F.2d 120, 123 (2d Cir. 1984); Moore
v. Vega, 371 F.3d 110, 116 (2d Cir. 2004).

> A parole officer's function is twofold: "to guide the
> parolee into constructive development" and to prevent
> "behavior that is deemed dangerous to the restoration
> of the individual into normal society." Morrissey v.
> Brewer, 408 U.S. at 478, 92 S.Ct. at 2598. To ensure
> that the conditions of parole are not being violated
> and to monitor the parolee's progress of reintegration
> into society, a parole officer, of necessity, must
> have investigative powers to gather information about
> the parolee's activities, environment and social
> contacts.

Thomas, 729 F.2d at 123. In furtherance of these investigative
powers, parole officers do not need a search warrant to search a
parolee and have the right to search a parolee without his
consent when there is reasonable suspicion that the individual
may be violating the terms of his release. See State v.
Whitfield, 599 A.2d 21, 24 (Conn. App. 1991) (Unlike law
enforcement officials, parole officers have the right to search
a parolee "when there is a mere suspicion that the individual
may be violating the terms of his release." (collecting cases));
accord Leniart v. Bundy, No. 3:09CV9(HBF), 2013 WL 1673025, at

*2 (D. Conn. Apr. 17, 2013). Accordingly, as previously noted by this Court, in Connecticut, "a parole officer may conduct searches of his parolees so long as a search is reasonably related to the parole officers' duty of investigating parole violations and enforcing parole conditions." Leniart, 2013 WL 1673025, at *2; see also Moore, 371 F.3d at 116; United States v. Newton, 369 F.3d 659, 668 (2d Cir. 2004).

"One of the principal purposes of a ... parole officer's observation and supervision responsibilities is to ensure that a convicted person under supervision does not again commit a crime." United States v. Reyes, 283 F.3d 446, 459-60 (2d Cir. 2002). Routine home visits, which are a condition of parole and do not require a search warrant or consent of the parolee, fall within the ambit of a parole officer's responsibilities. See United States v. Trzaska, 866 F. Supp. 98, 101-02 (E.D.N.Y. 1994) ("To be sure, 'home visits' by parole officers are among the lawful restrictions to which parolees have traditionally been subjected." (citation omitted)). During such visits, parole officers are entitled to seize contraband or evidence of a parole violation if it is in plain view and the parole officer has reasonable grounds to believe the item is contraband or constitutes evidence of a violation of a parole condition. See, e.g., Reyes, 283 F.3d at 468.

The parole officer's authority to search expands when he is investigating a potential violation of parole conditions. See Julius, 610 F.3d at 65. If the officer has reasonable suspicion that a violation of parole has been or is being committed, the parole officer may conduct any search of the parolee, his premises or property that is reasonably related to the officer's duties of investigating parole violations and enforcing parole conditions. See Newton, 369 F.3d 659 at 666.

Reasonable suspicion must be based on specific and articulable facts and not on a mere hunch. See United States v. Freeman, 735 F.3d 92, 96 (2d Cir. 2013). The totality of the circumstances of each case are considered to determine whether the parole officer has a particularized and objective basis to suspect that a violation of parole has been or is being committed. See id.; see also United States v. Cortez, 449 U.S. 411, 417 (1981).

Bearing this framework in mind, the Court turns to the parties' arguments.

### B. Seizure and Examination of the Micro-Cassette Tape

Plaintiff contends that because no express condition of his special parole, nor his consent, authorized the seizure of the micro-cassette, then the only lawful basis upon which to seize and examine the micro-cassette without a warrant was if Parole Officer Ellison's "actions were reasonably related to a

20

reasonable suspicion that a violation of parole has been or is being committed." Doc. #265, at 4 (citation and internal quotation marks omitted). Here, plaintiff specifically contends that "there was no evidence whatsoever – not a word of testimony or in a single exhibit – that reasonably linked Mr. Leniart's suspected violations of parole (namely, according to Mr. Ellison's trial testimony, sexual assault and provision of alcohol to minors) and the audio tape." Id. As such, plaintiff submits that no reasonable jury could conclude that defendant Ellison "had specific and articulable facts yielding a particularized and objective basis to suspect that the audio tape ... contained evidence of Mr. Leniart's suspected sexual assault and provision of alcohol to minors." Id.

In their response, defendants do not address the contention that the seizure and examination of the micro-cassette was not supported by plaintiff's consent or his specific conditions of supervised release, instead contending that there is "ample" evidence to support the jury finding that defendant Ellison had reasonable suspicion that plaintiff violated his parole conditions, and that the seizure and search of the micro-cassette was reasonably related to defendant Ellison's duties to investigate parole violations or enforce conditions. See generally Doc. #266. Accordingly, the Court turns first to whether the evidence adduced at trial supports a reasonable

juror in finding that defendant Ellison had reasonable suspicion that plaintiff violated his conditions of parole.

### 1. Reasonable Suspicion as to Plaintiff's Parole Violations

Although plaintiff does not seem to dispute this point, the Court nevertheless finds that the trial evidence supports a reasonable juror finding that defendant Ellison had reasonable suspicion that plaintiff violated his conditions of parole. Such a finding is supported by both the documentary and testimonial evidence of record. Specifically, the jury had before them the specific conditions of plaintiff's parole, including that he obey all laws, not consume alcoholic beverages, and have no contact in any manner whatsoever with minors. See Def. Ex. 505. The jury also heard the detailed testimony of defendant Ellison, who testified that based on information provided to him by the Connecticut State Police, including two witness statements (Def. Exs. 538, 539), which were corroborated by plaintiff's son (Def. Ex. 537), that defendant Ellison had reason to believe that plaintiff had violated his conditions of parole. Such witness statements, and the other information provided by the Connecticut State Police, coupled with defendant Ellison's knowledge, training and experience with sex offenders, provided the specific and articulable facts needed to form the basis of defendant Ellison's reasonable suspicion that plaintiff had violated his conditions of parole. Further supporting defendant

Ellison's reasonable suspicion was the information provided to defendant Ellison by Parole Officer Bransford, prior to the execution of the remand order, regarding the history of plaintiff's "past sexual offenses, past sexual conviction, [and] the type of behavior involved[.]" Tr. 467:7-15. Indeed, the jury heard that based on defendant Ellison's "knowledge and training with sex offenders," it was his belief "that [plaintiff] was recidivating, was not following his parole conditions, was violating possible numerous other conditions of his parole and that he had to be returned to custody in order to protect the public and to protect future victims[.]" Tr. 466:22-467:3.

The jury also heard the testimony of parole and law enforcement officers concerning plaintiff's conduct when officers were attempting to execute the remand order. Indeed, several officers testified as to plantiff's failure to wear his GPS device and his attempts to evade officers by hiding behind a stone wall on his property. See, e.g., Tr. 280:9-281:11, Tr. 325:15-16, 370:12-371:1, 443:15-22, 484:1-10; see also Def. Ex. 526 at 2 ("On September 25, 2007, you were instructed by Parole Officer Bransford to return to your approved residence by 2:00 p.m. You were instructed to place the GPS MTD on the charger and wait at your home for parole staff to arrive. You failed to make yourself available to parole staff by not answering the door. You were found outside your residence hiding behind a stone

wall, clearly eluding the parole staff and found without your GPS MTD box, which is required to be carried on your person at all time[s] when outside the residence."). Accordingly, any reasonable suspicion that plaintiff had violated a condition of his parole that was formed prior to executing the remand order was further elevated by plaintiff's conduct on September 25, 2007. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124–25 (2000) ("Headlong flight — wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. ... Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."); United States v. Pagan, No. 3:12CR267(AVC), 2013 WL 3967641, at *3 (D. Conn. July 31, 2013) ("[T]he second circuit has held that efforts to flee or evade law enforcement officers provide additional grounds to support reasonable suspicion." (citing United States v. Swindle, 407 F.3d 562, 568 (2d Cir. 2005))); Marcano v. City of Schenectady, 38 F. Supp. 3d 238, 257 (N.D.N.Y. 2014) ("Plaintiff's immediate flight when confronted by the police justifiably raised the officers' initial reasonable suspicion to a higher level.").

Accordingly, the evidence supports a reasonable juror finding that the totality of the circumstances supported

defendant Ellison's reasonable suspicion that plaintiff had committed a parole violation.

### 2. Reasonable Suspicion to Support Seizure of Micro-Cassette Tape

Plaintiff contends that the trial evidence does not support a reasonable juror finding that defendant Ellison's seizure of the micro-cassette tape was supported by "specific, articulable, particularized, and objective grounds linking the audio tape to the alleged sexual assault he was investigating." Doc. #274 at 2. As such, plaintiff contends that the seizure, and resulting examination of the micro-cassette tape (discussed further, infra), violated plaintiff's constitutional rights and the jury's verdict on this count of plaintiff's Amended Complaint cannot stand. See id. at 2-3. Defendants, however, contend that there is ample evidence that the seizure and resulting search of the tape was reasonably related to defendant Ellison's duties to investigate parole violations and/or enforce parole conditions. See generally Doc. #266.

At the outset, it is significant "that there is no statutory authority through which a Connecticut parole officer can obtain a search warrant." Leniart, 2013 WL 1673025, at *2. The jury was aware of this through the testimony of defendant

Ellison.[12] Accordingly, the Court focuses its inquiry on whether the evidence supports a reasonable juror finding that the seizure and examination of the micro-cassette by defendant Ellison was reasonably related to his duty of investigating parole violations and enforcing parole conditions. See Leniart, 2013 WL 1673025, at *2.

The Court turns first to the seizure of the micro-cassette tape and whether the trial evidence supports a reasonable juror's finding that this seizure was reasonably

_____

[12] The following colloquy occurred on defendant Ellison's re-direct examination:

Q: I heard you say a couple of times when Mr. Smith cross-examined you, you don't know how to get a search warrant. What do you mean by that?

A: Excuse me. What I meant, there is no mechanism to get a search warrant for a noncriminal matter. Search warrants are for criminal matters. Search warrants – parole officer[s] aren't even trained in getting search warrants because they don't apply to technical violations of parole matters under the jurisdiction of the Board of Pardons and Paroles. Those are noncriminal matters. The offenders are already convicted. They're in our jurisdiction. Search warrants are a realm of the police. The only warrant that parole officers apply for and are trained in are escape warrants because of the population that we supervise that is under the jurisdiction of the Commissioner of Correction. ... So I meant to say I don't know how to get a search warrant. I've never been trained. There is no – a search warrant would not be received or signed. There is no process because he have the authority to conduct searches when there is reasonable suspicion.

Doc. #266-2 at 524:19-525:16.

26

related to defendant Ellison's duty of investigating plaintiff's parole violations, specifically the alleged sexual assault of a seventeen year-old male, among others.

As previously discussed, the trial evidence supports a reasonable juror finding that defendant Ellison had reasonable suspicion that plaintiff had violated his conditions of parole, specifically as relevant here, that he had sexually assaulted a minor. The evidence adduced at trial also supports a reasonable juror finding that defendant Ellison had the requisite reasonable suspicion to link the micro-cassette to the alleged sexual assault he was investigating.

First, the jury had before them documentary and testimonial evidence of plaintiff's criminal history, which included convictions for sexual assault in the second degree, risk of injury to a minor, assault in the third degree, threatening, and reckless endangerment in the first degree. Parole Officer Bransford relayed this same information to defendant Ellison prior to the September 25, 2007, seizure.[13] See generally, Tr.

---

[13] The Parole Violation Report generated in connection with the September 25, 2007 incident states, in relevant part:

> Regarding your sexual assault and risk of injury convictions, you brought a 13-year-old female to a trailer located behind your house where you and her drank beer. At approximately 5:00 a.m., you forced her to have vaginal intercourse. The female victim told you to stop and you choked her several times until she nearly lost consciousness. You then forced her to

44:2-46:1, 120:4-121:8, Tr. 467:7-15; see also Def. Exs. 525, 535, 544, 545, 556. Criminal history is but one of many factors that can support a finding of reasonable suspicion. See United States v. Chandler, 15CR131(JMA)(SIL), 2016 WL 4076875, at *2 (E.D.N.Y. Aug. 1, 2016); contra United States v. Freeman, 479 F.3d 743, 749 (10th Cir. 2007) (defendant's parolee status and criminal history, without other particularized and objective facts, insufficient to provide reasonable suspicion).

Second, the jury heard evidence that the micro-cassette tape was found in plaintiff's laptop bag, which was found in plaintiff's bedroom, where the alleged sexual assault of the minor victim allegedly occurred. See Doc. #266-2 at 496:17-20; 498:12-499:4; 530:2-5; see also Def. Exs. 538-539. This is significant as parole officers Bransford, Ellison, and Cartagena

---

perform oral sex until you ejaculated in her mouth and kept her against her will.

You provided a version of the offense and you admitted to being in a trailer smoking marijuana and drinking with the under age female and you admitted to having sex with her.

As a result of all the information you are charged with in this violation of parole supervision, the following applies: Your past sexual criminal history and convictions with under age children, use of alcohol, and sexual encounters with a 17-year-old male by means of deception, make you a high risk to re-offend.

Def. Ex. 525 at 1-2 (sic).

testified that they were searching for anything that would be evidence of deviant sexual behavior, contact with minors, or any other parole violation. See, e.g., Doc. #266-2 at 260:4-7; 326:6-10; 326:24-327:8 ("We were looking for any storage device that he should not have had, whether it be a computer, a laptop, a computer – I mean desktop computer – anything he shouldn't have, whether it be alcohol, drugs, a human being, a child – anything we were looking for, anything that he would not be compliance with the conditions of his supervision."); 344:19-24.[14] The jury could reasonably infer, based on their experience, that such contact with minor(s), to whom defendant spoke on the phone, see Def. Ex. 539, could have been recorded on the micro-cassette tape. Defendant Ellison also testified that he

> was looking for anything that would be any evidence of any of the potential crimes or parole violations that were listed in those statements and any of the violations that I planned to charge Mr. Leniart with. It was important for me to determine if Mr. Leniart had contact with the victim of those statements. ... It was important for me to determine if there were any references to the use of alcohol or illegal drugs or any other sexual assault victims. So it was important to seize that and any other device or object that was relevant to my parole investigation, to this parole investigation. ... We have a duty to fully investigate parole violations, and we did.

---

[14] Parole Officer Bransford also testified about what supported the search of plaintiff's residence under plaintiff's conditions of parole and his prior discussions with plaintiff on this point. See Doc. #266-2 at 295:17-298:6.

Id. at 494:8-24.[15] Defendant Ellison also testified about his ability to seize the micro-cassette tape, stating that he had reasonable suspicion that the tape contained evidence of a parole violation in light of his witnessing plaintiff hiding behind a stonewall and not wearing his GPS device. See id. at 498:20-499:4; see Pagan, No. 3:12CR267 AVC, 2013 WL 3967641, at *3; Marcano, 38 F. Supp. 3d at 257. Defendant Ellison further explained:

> My authority to seize a micro-cassette tape in this instance was based on reasonable suspicion related to the parole violation, reasonable suspicion that a parole violation had occurred. ... The computer access agreement is used for routine examinations when there is no reasonable suspicion. Taking someone's computer, taking something from an offender to have it examined, based on the time frames of the computer lab, can go into months. It's an intrusive action. We routinely take computers for compliance reasons. There is not reasonable suspicion at the time. That's why we have the computer access agreement. When there's reasonable suspicion, I would have the authority to seize any device, any item, related to that investigation, such as a micro-cassette recorder, a laptop computer, VHS tapes, a beer can.

Id. at 522:14-523:6. Accordingly, the evidence supports a reasonable juror's finding that defendant Ellison had objective and particularized facts upon which to base the seizure of the micro-cassette, including: (1) the nature of plaintiff's

---

[15] Defendant Ellison also testified about his ability to search parolees: "My ability to search is based on reasonable suspicion, which is granted to me by parole pursuant to my duties. The premise of reasonable suspicion to search parolees when there's a violation, that's the authority we rely on." Doc. #266-2 at 515:17-23.

criminal history; (2) that the micro-cassette tape was found in plaintiff's bedroom where the alleged sexual assaults occurred; and (3) plaintiff's attempt to evade police.

To the extent plaintiff argues there was no evidence upon which the jury could link the micro-cassette to the alleged sexual assault, the Court disagrees. In addition to the evidence cited above, the jury received evidence that plaintiff was required to register as a sex offender (Def. Ex. 507), and that as part of his parole, he was required to participate in treatment for problem sexual behavior (Def. Ex. 505). The jury also heard testimony from Parole Officer Cartagena regarding the behaviors of sex offenders, and why VHS tapes and other "media storage devices", such as the micro-cassette, were collected by the parole officers:

> We look at these media tapes in efforts for looking at further violations. It's not uncommon for individuals who have been convicted of a sexual offense to record some of these acts or further acts that would happen. So we've got to monitor in order to see if there's any violations there. We have to, you know, gather that information, look at it, and make sure the person is complying with their conditions.

Doc. #266-2 at 376:9-20.

The jury additionally heard testimony from plaintiff that he would use the micro-cassette to surreptitiously record third parties, in particular the police. See Doc. #266-2 at 72:2-16, 90:14-17. Plaintiff also testified that he advised the parole

31

and law enforcement officers on September 25, 2007, that they were being monitored, both audibly and visually, by his home security system. See id. at 84:12-14; 91:12-14.

Accordingly, based on the above, the jury permissibly drew the inference that the micro-cassette was reasonably related to the parole violation being investigated, namely the alleged sexual assault of a minor in plaintiff's bedroom, among others. The Court does not find, based on the evidence of record, that a reasonable juror would be compelled to accept the position of plaintiff, or that there is a complete absence of evidence supporting the verdict.

### 3. Examination of Micro-Cassette Tape

Plaintiff next argues that even if the seizure of the micro-cassette were supported by reasonable suspicion, the examination of the tape was not, as this constituted a separate, warrantless examination, not supported by any exigency. See Doc. #274 at 4. In support of this argument, plaintiff primarily relies upon the Sixth Circuit case of United States v. Carnes, 309 F.3d 950, 963 (6th Cir. 2002). See Doc. #274 at 4-9. Defendant responds that the cases relied upon by plaintiff are distinguishable and do "not help the plaintiff." Doc. #266 at 15.[16]

---

[16] In support of this point, plaintiff appears to argue that the examination of the tape "violated the Fourth Amendment because

Plaintiff points to two cases in support of the general proposition that although the initial seizure of a tape may be lawful, subsequent examination of such a tape must comply with the various proscriptions of the Fourth Amendment. See Doc. #274 at 4 (citing Walter v. United States, 447 U.S. 649, 657 (1880); United States v. Hunt, 366 F. Supp. 172, 181 (N.D. Tx. 1973), rev'd on other grounds 505 F.2d 931 (5th Cir. 1974)). Although these cases generally stand for the proposition cited, it is significant that they do not address search and seizures in the parole context, particularly in a state, such as Connecticut, where there is no mechanism for parole officers to obtain search warrants. See Walter 447 U.S. at 652 (addressing the warrantless viewing of seized tapes by FBI agents); see also Hunt, 366 F. Supp. at 176 (addressing the warrantless viewing of tapes by police officers). Accordingly, at the inception, plaintiff's arguments on this point appear to conflate the Fourth Amendment in the context of law enforcement investigations and parole investigations. Nevertheless, the Court turns to the case upon which plaintiff primarily relies, Carnes.

Plaintiff, relying on Carnes, contends "the warrant requirement for examination of audio tapes has applied to

---

there was no evidence linking it to the alleged sexual assaults." [Doc. #274 at 4]. The Court, however, rejects this argument for the same reasons discussed in connection with the seizure of the micro-cassette tape.

33

parolees, despite their otherwise generally reduced expectations

of privacy." Doc. #274 at 2. The facts and timeline of this

case, however, distinguish it the circumstances presented in

Carnes. Notably, in Carnes:

> Parole officers and officers from the Auburn Hills,
> Michigan police department executed an arrest warrant
> against Carnes[.] After arresting Carnes, the officers
> conducted a warrantless search of the residence,
> suspecting that he was violating the terms of his
> parole by living in a location other than that
> specified in his conditions of parole and possibly
> committing additional crimes. During the search, the
> officers discovered cassette tapes, [which] [] later
> proved to be recordings of telephone conversations
> obtained through a wiretap illegally placed on
> Kellum's phone line.

Id. (emphasis added) By contrast here, at the time parole

officers entered plaintiff's home, they were solely conducting

an investigation into possible parole violations. No arrest

warrant had been issued as to the alleged sexual assaults, which

formed defendant Ellison's belief that plaintiff had violated a

condition of his parole. Indeed, such a warrant was not issued

until sometime after December 4, 2007, when the application for

the warrant was first made. See Def. Ex. 540. Furthermore, by

contrast here, the state police never entered plaintiff's home

and were merely assisting with the execution of the remand

order. Although plaintiff downplays these distinctions, they are

significant as the application of Fourth Amendment principles

greatly differs between law enforcement officers and parole officers.

Second, the Carnes court specifically noted the apparent motivation behind the seizure of the tapes was not "to help establish a violation of the residency requirement of Carnes's parole agreement." Carnes, 309 F.3d at 960. Rather, because these tapes were listened to well after Carnes' parole violation, it suggested to the Carnes court that there was some other motivation behind the seizure of the tapes. By contrast here, the motivation behind the seizure and subsequent examination micro-cassette tape was solely for the purpose of investigating and/or establishing an alleged parole violation. Indeed, upon defendant Ellison discovering the micro-cassette tape, he submitted the tape to the State lab for examination. Additionally, because there was no arrest warrant issued for plaintiff at the time the seizure occurred, it cannot be surmised here that any other motivations, i.e., for use in a criminal prosecution, were behind the seizure and subsequent examination of the tape. Simply, unlike Carnes, "the present case does not involve overtones that regular law enforcement officers, in effect, usurped a parole officer's ability to conduct a special needs search based on less than probable cause." United States v. Loney, 331 F.3d 516, 522 (6th Cir. 2003) (noting that the Carnes "majority emphasized that where

the government claims that special needs justify a search and seizure based on reasonable suspicion rather than probable cause, a court must look to the 'actual motivations of individual officers.'" (quoting Carnes, 309 F.3d at 960)).[17]

Finally, plaintiff also contends that "[n]ot having a procedure for obtaining a constitutionally required warrant is no excuse for violating the constitution[,]" and that there is in fact a mechanism for obtaining a warrant when evidence is turned over the state police and/or its lab. See Doc #274 at 5 n.4. Plaintiff notes, as an example, that the 2006 search, also at issue in the trial, was conducted and supervised by parole officers, and that when suspected marijuana was found during that search, it was handed to the state police for further examination, and when it tested negative in the field, the state police obtained a court order before submitting it for laboratory testing. See id. However, when the marijuana was discovered during the 2006 search, "believing it was contraband, a new criminal case number was assigned." Tr. 405:2-5. Thereafter, a court order was obtained to authorize the laboratory examination of the marijuana. See Tr. 421:3-422:12.

_____

[17] Even if the Court were to find Carnes persuasive, which it does not, this Sixth Circuit authority is not binding on the Court. Carnes does, however, rely on the Second Circuit case of United States v. Johnson, 994 F.2d 980 (2d Cir. 1993). This case, however, also pertains to a seizure and subsequent examination of tapes by federal law enforcement agents. Accordingly, Johnson is similarly unhelpful to this Court's analysis.

Here, no criminal case number was ever assigned to the micro-cassette tape. As a result, defendant Ellison could not get a court order for the examination of the tape, because at that time, there was no criminal case number pending for the investigation conducted on September 25, 2007.

Accordingly, in light of the information available to the jury, including that: there is no warrant mechanism available to parole officers, the seizure and search of the micro-cassette was reasonably related to the investigation of potential parole violations, and the other grounds forming defendant Ellison's reasonable suspicion discussed above, the jury reasonably found in defendant Ellison's favor.

IV.   **CONCLUSION**

Accordingly, for the reasons articulated above, the Court **DENIES** plaintiff's Renewed Motion for Judgment as a Matter of Law. [**Doc. #265**].

This is not a Recommended Ruling.  The parties consented to proceed before a United States Magistrate Judge on April 23, 2013 [Doc. #44], with appeal to the Court of Appeals.  Fed. R. Civ. P. 73(b)-(c).

ENTERED at Bridgeport, Connecticut this 16th day of March, 2017.

        /s/
        HOLLY B. FITZSIMMONS
        UNITED STATES MAGISTRATE JUDGE